UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JEFF  MONROE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:14-cv-00252-SEB-DML |
| | ) | |
| STATE OF INDIANA, DEPARTMENT | ) | |
| OF TRANSPORTATION, | ) | |
| BRANDYE  HENDRICKSON | ) | |
| Commissioner, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment [Docket No. 41], filed on March 9, 2015, pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff Jeff Monroe ("Mr. Monroe") brings this claim against his former employer, Defendants State of Indiana Department of Transportation ("INDOT") and INDOT Commissioner Brandye Hendrickson in her official capacity, alleging that Defendants failed to accommodate his disability (Post-Traumatic Stress Disorder) and discriminated against him because of his disability, in violation of the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq*., as amended by the ADA Amendments Act ("ADAAA"), and Section 504 of the Rehabilitation Act.  For the reasons detailed below, we GRANT Defendants' Motion for Summary Judgment.

1

**Factual Background**

Mr. Monroe was hired on at INDOT on January 6, 1992, where he was employed for approximately twenty years until his termination on February 4, 2013. During his tenure with INDOT, Mr. Monroe held several positions, including his most recent assignment as a unit foreman on the night shift. As a unit foreman, Mr. Monroe supervised approximately fourteen full-time employees and approximately four seasonal employees. During the time period relevant to this litigation, Mr. Monroe was supervised by Terry George, the Sub-district Operations Manager for the Indianapolis Sub-district of INDOT.

**Plaintiff's Performance Evaluations**

Mr. Monroe consistently received positive performance evaluations in his role as unit foreman. Mr. George awarded him "Exceeds Expectations" ratings on his 2010, 2011, and 2012 performance evaluations. The positive 2012 evaluation was issued on January 7, 2013, less than one month before his termination. Although Mr. George testified that he had "personally counseled" Mr. Monroe on several occasions over the years about his management style, he did not maintain any notes of these conversations. In any event, it is undisputed that Mr. Monroe was not subjected to any disciplinary actions during the several years preceding his termination.

**Plaintiff's Personal Struggles**

According to Mr. Monroe, over the course of his employment with INDOT, he responded to more than one hundred fatality crash sites. One of his duties as unit foreman was to assist in the cleanup of human remains from the road. In the course of

2

performing those duties, he witnessed several tragic events, including the death of one of his co-workers which occurred as the result of a work-related accident.  Mr. Monroe testified that following his co-worker's death, he would at times wake in the middle of the night, covered in sweat and seeing visions of his deceased co-worker.

Mr. Monroe has also dealt with challenging personal circumstances in recent years.  He is a Gulf War combat veteran.  Less than three months before his termination, Mr. Monroe's sister passed away from cancer.  She had moved into Mr. Monroe's home a few months before her death and had received hospice care while residing there.  Mr. Monroe testified that towards the end of his employment with INDOT he had become moody and his family members had noticed that he was becoming more irritable and easily upset.

**Plaintiff Requests Transfer**

In December 2012, Mr. Monroe approached Mr. George to request a transfer to Shelbyville, stating that he was stressed at work and "burned out" and wanted to be transferred to a day position.  Mr. Monroe testified that he also told Mr. George that there was "something wrong with [him]" and that he "couldn't sleep."  Monroe Dep. at 35, 80-81.  Mr. George told Mr. Monroe that he would look into it, and, when he did, he discovered there were no day positions available.  However, Mr. George did not report this information to Mr. Monroe.

In January 2013 (at some point prior to January 25), after Mr. Monroe did not hear anything from Mr. George about his transfer request, Monroe again approached George and George's supervisor, J.D. Brooks, the Greenfield District Highway Maintenance

3

Director, to request a transfer to a day position in Shelbyville.  On this occasion, he was told there were no such positions available.  According to INDOT, Mr. Monroe then requested that a position be created allowing him to travel around the district in order to train other units in traffic control or operational activities.  Mr. Monroe contends that he was not asking INDOT to create a new position; rather, he merely suggested that INDOT temporarily move some foremen around for "cross training" purposes.  Monroe Dep. at 37.  Specifically, Mr. Monroe testified he told Mr. George and Mr. Brooks that "[o]ne of the day foremen that's probably never been on nights could come see how the night crews work" so that Mr. Monroe could switch with the day foreman and "they'd get to see different things."  *Id.*  When INDOT did not transfer him, on January 29, 2013, Mr. Monroe requested that INDOT place him in a non-supervisory highway technician position in order to get off the night shift because he was "so burnt out and depressed and couldn't sleep."  *Id.* at 35.  INDOT never transferred Mr. Monroe to a non-supervisory highway technician position.

**The January 24 Incident**

On January 24, 2013, Mr. Monroe was scheduled to work his regular 8:00 p.m. to 6:00 a.m. shift.  When he arrived at work, he checked his email and made staffing assignments.  Because snow was predicted for the following morning at 4:00 a.m., Mr. Monroe needed to send some of his crew to another unit to help prepare that unit's snow equipment.  During the evening's safety briefing, Mr. Monroe informed his crew members that some of them had to report to the other unit.  Mr. Monroe contends he did not yell during the briefing but that he did "get loud" because "when there's a lot of

4

people and there's 18 people and they're all trying to voice, sometimes you got to get loud to be heard."  Monroe Dep. at 25.

According to Mr. Monroe two of his crew members, Johnny Perkins and Josh McClung, became "hostile" and asked, "Why the fuck do we got to go do everybody's work all the time?"  *Id.* at 12-13.  Mr. Monroe proceeded to engage in a back-and-forth conversation with Mr. Perkins, who told Mr. Monroe that Monroe did not respect his crew members and always required them to do the work of other units.  Mr. Monroe became frustrated and told Mr. Perkins that respect was a "two-way street" and had to be earned.  Mr. Monroe then dropped his clipboard on his desk and said, "Fuck this.  Danny, take over."  *Id.* 13-14, 25-26, 31-32.  Danny Wise was one of Mr. Monroe's crew leaders.  Mr. Monroe then retreated into his office in order to calm down.  *Id.* at 14.

When Mr. Monroe returned to the garage, he asked to speak with Mr. Perkins in the wash bay.[1]  Mr. Monroe testified that he asked Mr. Perkins, "What's up?  You know, why are you giving me such a hard time?"  *Id.* at 15.  In response, Mr. Perkins threatened to fight him.  According to Mr. Monroe, he then invited Mr. Perkins to come by his house to get something to eat and drink and discuss why Perkins "wants to fight all the time," as Monroe had previously counseled Perkins about threatening to fight his co-workers.  *Id.* 32-33.  No further interaction between Mr. Monroe and Mr. Perkins occurred.

**Complaints Regarding the January 24 Incident**

---

[1] It was Mr. Monroe's usual practice to speak with employees in the wash bay because his office lacked privacy.

The next day, on Friday, January 25, 2013, at the conclusion of their night shift, approximately seven or eight of the INDOT employees who were all supervised by Mr. Monroe came to Mr. George's office to file complaints about Mr. Monroe's ongoing treatment of them.  These employees reported to Mr. George that Mr. Monroe screamed and yelled at them, treated them with little or no respect, threatened some of them with their jobs, and publicly ridiculed one individual who has a hearing impairment.  They stated that the situation was intolerable and that they refused to continue to work under those conditions.

Because of the seriousness of the allegations, Mr. George asked Mr. Brooks, his direct supervisor, to be present to hear the employees' reports regarding Mr. Monroe's treatment of them.  Mr. Brooks then telephoned Jeff Neuman, the Human Resources manager of the Greenfield District, to request that he also be present to hear the employees' allegations.  Mr. Brooks and/or Mr. Neuman took notes at the meeting and the employees also prepared written statements outlining their complaints regarding Mr. Monroe's treatment of them.

Following the January 25 meeting, an investigation into the allegations against Mr. Monroe was undertaken by Mr. Neuman.  It was decided that a meeting with Mr. Monroe would occur on Monday morning to discuss the allegations.

**Plaintiff Reports a Diagnosis of Post-Traumatic Stress Disorder**

On Sunday evening, January 27, 2013, Mr. George telephoned Mr. Monroe at his home to tell him that some complaints against him had been made and that he was to report to George's office for a meeting on Monday, January 28, 2013.  Mr. Monroe

6

contends that Mr. George did not specify what the complaints were about or that they were made by INDOT employees.  During that telephone conversation, Mr. Monroe informed Mr. George that he had recently consulted with a therapist and that "they believed that [he] had [Post-Traumatic Stress Disorder] PTSD."  Monroe Dep. at 20. Prior to that conversation, Mr. George had no knowledge that Mr. Monroe had ever seen a doctor or therapist for any physical or mental health issues.

On January 28, Mr. Monroe attended the meeting with Mr. George, Mr. Neuman, and Mr. Brooks, during which Mr. Monroe disclosed for the first time to Mr. Neuman and Mr. Brooks that he believed he suffered from PTSD.[2] Although Mr. Monroe had told Mr. George that he had consulted a therapist who had diagnosed him with PTSD, Mr. Monroe testified by deposition that he told Neuman, Brooks, and George that he had PTSD based on the remark made by a woman with whom he had spoken by telephone in scheduling a therapy appointment who said it "sounded" to her like he had PTSD.

It is undisputed that Mr. Monroe did not see a therapist or other medical professional before January 29, 2013.  However, Mr. Monroe contends that he began trying to schedule a therapy appointment prior to the January 24 incident.  Mr. Monroe testified that he began his efforts to secure treatment during the week of January 21 by telephoning an 800 number a few times and contacting his insurance provider.  Mr. Monroe also spoke with a Licensed Clinical Social Worker on January 28.  According to

---

[2] There is some dispute as to whether Mr. George told either Mr. Brooks or Mr. Neuman about Mr. Monroe's possible PTSD diagnosis before the January 28 meeting, but it is undisputed that the January 28 meeting was the first time Mr. Monroe disclosed that information to Mr. Brooks and Mr. Neuman.

Mr. Monroe, the individuals with whom he spoke told him they believed he had PTSD, but he did not actually see a therapist until January 29.

At the January 28 meeting, Mr. Monroe was given the option of taking vacation or reporting to a different location until the investigation was completed. Mr. Monroe chose to take vacation.

**The Investigation and Plaintiff's Termination**

INDOT's notes from its investigation into the complaints against Mr. Monroe include statements from each of the employees whom Mr. Monroe supervised. The comments from the employees included both positive and negative observations regarding Mr. Monroe's conduct. Some employees defended the behavior exhibited by Mr. Monroe on January 24, stating that Monroe "knows his job and gets things done" and "if he yells, he's just doing his job." Dkt. 42-8. Another employee reported that Mr. Monroe's crew "tends to blow things out of proportion." *Id.* However, others reported that Mr. Monroe had been "testy lately – something's wrong"; that he was "bipolar – always like that but worse lately"; and that he "picked on" and talked to one of his employees "like he was mentally ill." *Id.* A number of employees also stated that Mr. Monroe was "demeaning" and "threatens." *Id.* During a group interview with four of Mr. Monroe's current and former subordinates, all four reported that "Jeff's amount of sleep is a key factor in his outbursts." *Id.*

During Mr. Monroe's interview on January 29, he told Mr. Brooks and Mr. Neuman that he "doesn't sleep" much and that "[n]o sleep causes him to get frustrated at things" that should not upset him. *Id.* at 10-11. Mr. Monroe stated that "two weeks ago

8

is when he realized that something was wrong." *Id.*  He also told Mr. Brooks and Mr. Neuman that witnessing the death of his co-worker and "fatality cleanup" caused his stress. *Id.*  Mr. Monroe "equat[ed] his position to a police or fireman's stress" and stated "they get counseling after fatalities." *Id.*  He recommended that INDOT "send people for counseling for stressful situations." *Id.*  Finally, he said that he "just can't relax" and that he "wants his life back." *Id.*

On February 4, 2013,[3] after the investigation into the employees' allegations against Mr. Monroe had been completed, Mr. Monroe was terminated.  INDOT contends he was terminated for consistently exhibiting hostile and intimidating behavior in the execution of his supervisory duties.  Although lesser levels of discipline were discussed, the decisionmakers unanimously determined that the seriousness of Mr. Monroe's behavior necessitated termination.

**Plaintiff's Medical History**

Mr. Monroe did not provide anyone at INDOT with documentation of his PTSD diagnosis at any point prior to filing the instant lawsuit.  According to Mr. Monroe, this is because INDOT never requested medical documentation of his disability.  Mr. Monroe also underwent annual physicals to maintain his CDL license and consistently checked "no" in answer to all of the questions regarding whether he suffered from emotional, mental health, or sleep-related issues.

---

[3] The parties acknowledge that Mr. Monroe's termination letter includes a typographical error, to wit, the letter lists the year of termination as 2012 rather than 2013.

Mr. Monroe's certified medical records establish that he was seen by a therapist at Gallahue Mental Health on two occasions: January 29, 2013 and February 4, 2013.  At the January 29 appointment, Mr. Monroe reported sleeping only two hours per day, being "irritable at work and with family," and experiencing "stressful aspects in work environment."  Dkt. 42-7.  The therapist noted that Mr. Monroe "appears to have Major Depression and PTSD" and recommended that Mr. Monroe attend therapy twice per month and return for a medication evaluation.  *Id.*

Mr. Monroe was seen by a clinical nurse specialist on February 7, 2013 for the purpose of obtaining a prescription for depression medication.  However, although Mr. Monroe was prescribed the medication, he never took it.  Mr. Monroe testified that he did not see the therapist after "his insurance ran out" which occurred a few weeks after he was terminated and that he had never been to a psychologist or therapist prior to his appointment with the therapist at Gallahue in January 2013.

**The Instant Litigation**

On February 20, 2014, Mr. Monroe filed his Complaint in this action.  Mr. Monroe filed an Amended Complaint on June 20, 2014, alleging violations of the Americans With Disabilities Act as Amended and Section 504 of the Rehabilitation Act of 1973.  Defendants moved for summary judgment on March 9, 2015.  That motion is now fully briefed and ripe for ruling.

## <u>Legal Analysis</u>

**I.      Standard of Review**

10

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See *id.* at 255. However, neither the mere existence of some alleged factual dispute between the parties, *id.* at 247, nor the existence of some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th

Cir. 1994).  Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact finder could find for the party opposing the motion, summary judgment is inappropriate.  *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but it is mandated.  *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element necessarily renders all other facts immaterial.  *Celotex*, 477 U.S. at 323.

## II.   Discussion

### A.   Eleventh Amendment

We first address INDOT's contention that Mr. Monroe's claims for compensatory damages brought under Title I of the ADA and Section 504 of the Rehabilitation Act are barred by the Eleventh Amendment.

#### 1.   ADA Claim

"The Eleventh Amendment immunizes the states against damage suits brought in federal court by their own citizens, unless the state has waived immunity or Congress has validly abrogated the immunity."  *Strong v. Ill. Dep't of Human Servs.*, 40 Fed. App'x 297, 297-98 (7th Cir. 2002) (citations omitted).  Here, it is clear (and Mr. Monroe does not dispute) that Plaintiff's claims against Defendants for damages under the ADA are

barred by the Eleventh Amendment.  Mr. Monroe argues, however, that he may proceed against Commissioner Hendrickson in her official capacity on his ADA claims seeking prospective relief, pursuant to the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908).

"In determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Public Serv. Commission of Maryland*, 535 U.S. 635, 645 (2002) (quotation marks and citations omitted).  In *Kashani v. Purdue University*, 813 F.2d 843, 848 (7th Cir. 1987), the Seventh Circuit permitted a discrimination suit to go forward against the individual named state officials for injunctive relief of reinstatement into a graduate program.  Citing *Ex Parte Young*, the court stated that "a suit for prospective injunctive relief is not deemed a suit against the state and thus is not barred by the Eleventh Amendment." *Id.*

In this case, in addition to compensatory damages, Mr. Monroe has requested injunctive relief in the form of reinstatement and/or front pay, based on alleged violations of the ADA.  Defendants, however, argue that Mr. Monroe has not alleged an ongoing violation of federal law to support application of *Ex Parte Young* in this case.  It appears from Mr. Monroe's complaint that the crux of the relief he seeks is compensatory damages.  But because he also seeks reinstatement and Defendants do not contend that reinstatement is impermissible in this case, reading Mr. Monroe's complaint in the

broadest manner possible, we hold that claims against Commissioner Hendrickson

seeking reinstatement are not barred by the doctrine of sovereign immunity.

### 2.    Section 504 Claim

Mr. Monroe also brings claims under Section 504 of the Rehabilitation Act.  In

1986, Congress amended the Rehabilitation Act to provide that a "State shall not be

immune under the Eleventh Amendment of the Constitution of the United States from

suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973…."

42 U.S.C. § 2000d-7.  This provision "expressly waives state sovereign immunity for

violations of 'section 504 of the Rehabilitation Act of 1973 … by recipients of Federal

financial assistance.'"  *Sossamon v. Texas*, 131 S.Ct. 1651, 1662 (2011) (emphasis

removed).  It is undisputed that INDOT is an agency that receives federal funds.

Accordingly, it is not immune from a suit for damages under Section 504.  *See, e.g.*,

*Everybody Counts, Inc. v. Indiana Regional Planning Commission*, 2006 WL 2471974

(N.D. Ind. 2006).

### B.    ADA and Rehabilitation Act Claims

Under the ADA "[n]o covered entity shall discriminate against a qualified

individual on the basis of disability."  42 U.S.C. § 12112(a).  Similarly, the Rehabilitation

Act prohibits discrimination against a "qualified individual with a disability … solely by

reason of her or his disability."  29 U.S.C. § 794(a).  "Such causation language is unique

to the Rehabilitation Act, which otherwise 'incorporates the standards applicable to Title

I of the ADA."  *Scheidler v. Indiana*, No. 1:13-cv-0937-WTL-DML, 2016 WL 1057025,

at *4 (S.D. Ind. Mar. 17, 2016) (quoting *Brumfield v. City of Chi.*, 735 F.3d 619, 630 (7th Cir. 2015)).  Discrimination under both the ADA and Rehabilitation Act includes a failure to accommodate.

### 1.    Qualified Individual with a Disability

Here, Mr. Monroe brings claims for discriminatory termination and failure to accommodate under both the ADA and the Rehabilitation Act.  In order to survive summary judgment on any of his claims, Mr. Monroe first must establish that he is a qualified individual with a disability, which is defined under the statutes as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  INDOT disputes only whether Mr. Monroe has established that he suffers from a disability as defined by the ADA and Rehabilitation Act, arguing that he has failed to make the requisite showing and that his claims fail on this basis.

An individual is disabled under the ADA and the Rehabilitation Act if he (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such an impairment, or (3) is regarded as having such an impairment.  42 U.S.C. § 12102(1); *see also Mays v. Principi*, 301 F.3d 866, 869 (7th Cir. 2002) (explaining that the definition of disability is the same under the ADA and the Rehabilitation Act).  When Congress passed the ADA Amendments Act ("ADAAA") in 2008, it "stated that the term 'substantially limits' should be interpreted broadly to provide wide coverage."  *EEOC v. AutoZone, Inc.*, 630 F.3d 635, 641 n.3 (7th Cir. 2010).

15

The ADAAA implementing regulations provide that "[t]he question of whether an individual meets the definition of disability under [the ADA] should not demand extensive analysis."  29 C.F.R. § 1630.1(c)(4).  The "impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. § 1630.2(j)(1)(ii).  Rather, the impairment need only "substantially limit[] the ability of an individual to perform a major life activity as compared to most people in the general population."  *Id.*

Here, Mr. Monroe contends that he is disabled under the first prong of the disability definition, to wit, that he suffers from mental impairments (PTSD and depression), which substantially limit him in the major life activity of sleeping.  INDOT argues that Mr. Monroe has failed to show that he was disabled at the time he alleges he was discriminated against because he was not diagnosed with depression and PTSD until January 28, 2013, *after* INDOT had allegedly failed to accommodate him by declining to transfer him to a day shift and had already begun the investigation into the January 24 incident that ultimately resulted in Mr. Monroe's termination.

It is undisputed that Mr. Monroe was diagnosed with depression and PTSD on January 28, 2013 and that both PTSD and depression qualify as mental impairments under the ADA and Rehabilitation Act.  Although INDOT argues that this diagnosis did not get made until after the alleged discrimination had already occurred, that argument goes toward whether INDOT had knowledge of Mr. Monroe's disability rather than whether he was in fact disabled.  Accordingly, we find that Mr. Monroe has provided

16

sufficient evidence to establish that he suffered from mental impairments.  That is not the end of the inquiry, however, as will become clear, because it is not enough simply to suffer from an impairment; rather, that impairment must substantially limit a major life activity.

Mr. Monroe contends that his depression and PTSD substantially limited him in the major life activity of sleeping.  INDOT does not dispute that sleeping is considered a major life activity under the ADAAA.  *See Scheerer v. Potter*, 443 F.3d 916, 920-21 (7th Cir. 2006).  However, INDOT contends that Mr. Monroe has failed to present evidence to establish that his sleep issues were substantially limiting.  As noted above, the 2008 Amendments to the ADA lessened the burden a plaintiff must meet in order to establish a substantial limitation on a major life activity.  Specifically, the Amendments provide that an "impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. § 1630.2(j)(1)(ii).  Rather, the impairment need only "substantially limit[] the ability of an individual to perform a major life activity as compared to most people in the general population."  *Id.*  Although a close call, we are persuaded that Mr. Monroe has presented sufficient evidence to raise a genuine issue of material fact regarding whether his depression and/or PTSD substantially limited him in the major life activity of sleeping.

Mr. Monroe has testified that during the relevant time period he "couldn't sleep, couldn't concentrate," that he was "burnt out" and experiencing increased irritability.

17

Monroe Dep. at 35, 80-81, 83.  He also told his supervisors that he was not sleeping and that he was seeing a vision of his co-worker who died on the job approximately ten years before and that he would wake up "totally soaked with sweat." *Id.* at 83-86.  Mr. Monroe's medical records show that he made similar reports to a therapist and clinical nurse specialist on January 29, 2013 and February 7, 2013, respectively.  Those reports memorialize his complaints that he was "experience[ing] insomnia and early awakening," that he was "irritable at work and with family" and that he was experiencing "recurring images of a coworker who was crushed to death at his work place 10 years ago." Dkt. 42-7.  Mr. Monroe also reported to the therapist that he was "[s]leeping only two hours a day recently" and that he was experiencing sleep issues "most days." *Id.* at 7.

It is true that the majority of this evidence consists only of Mr. Monroe's self-described sleep issues and their effect on his daily living.  However, as the Seventh Circuit recently observed, "[n]o language in the ADA or implementing regulations states that medical testimony is required" to prove a substantial limitation. *AutoZone, Inc.*, 630 F.3d at 644 (holding that there was no need for medical testimony where plaintiff's personal testimony regarding his limitations was corroborated by his wife's testimony and supported by evidence of well-documented impairments).  Here, Mr. Monroe reported to the therapist that he was sleeping only two hours per day and testified that he was having visions of his dead co-worker that were disrupting his sleep and that his lack of sleep was making him irritable both at work and at home with his family.  There is also evidence in the record that his family members as well as his co-workers noticed his

18

increased irritability and connected his behavior to a lack of sleep.  Under the less demanding standard of the ADAAA, this evidence is sufficient to raise a genuine issue of material fact regarding whether Mr. Monroe's diagnosed depression and PTSD substantially limited him in the major life activity of sleeping.[4]  *See Ceska v. City of Chi.*, No. 13 C 6403, 2015 WL 468767, at *3 (N.D. Ill. Feb. 3, 2015) (holding that a reasonable jury could find that the  plaintiff who reported sleeping less than three or four hours a night was substantially limited in the major life activity of sleeping under the ADAAA).

Having found that the question of whether Mr. Monroe is a qualified individual with a disability must be resolved by a jury, we turn to address the remaining elements of his discriminatory termination and accommodation claims under the ADA and Rehabilitation Act.

### 2.    Discriminatory Termination

A plaintiff may proceed under either the direct or indirect method of proof to establish a claim for disability discrimination.  *Hooper v. Proctor Health Care, Inc.*, 804 F.3d 846, 853 (7th Cir. 2015).  Under the direct method, a plaintiff must establish: (1) he is disabled within the meaning of the ADA and/or Rehabilitation Act; (2) he was qualified to perform the essential functions of the job with or without accommodation;

---

[4] Having found that Mr. Monroe has satisfied the first prong of the disability definition, we need not address his alternative argument that he is disabled under the third prong of the definition, to wit, that INDOT regarded him as disabled.

and (3) he was terminated because of his disability.  *Id.*  To establish the third prong, the plaintiff must "show that his disability was a 'but for' cause of his termination, which can be demonstrated through direct or circumstantial evidence, with circumstantial evidence encompassing, among other things, suspicious timing and pretext for the adverse employment action.  *Id.* (internal citations omitted).

To prove a disability discrimination claim under the indirect method of proof, a plaintiff must establish that (1) he is disabled pursuant to the ADA and/or Rehabilitation Act; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated, non-disabled employees more favorably.  *Id.*  If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for the employment action.  *Id.*  If the employer does so, the plaintiff must then present evidence demonstrating that the employer's nondiscriminatory reason is pretextual.  *Id.*

Although the Seventh Circuit has "recently questioned the continued utility of the direct and indirect methods of proof in analyzing discrimination claim," the court has "continued to separately consider them."  *Id.*  However, as Mr. Monroe highlights, "the ultimately question under both methods, and which is relevant here, is 'whether a reasonable jury could find prohibited discrimination.'"  *Id.* (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014)).

Here, Mr. Monroe has proceeded under the indirect method of proof, so we follow his lead and apply that framework.  As we have discussed *supra*, Mr. Monroe has made a sufficient showing at this stage of the litigation as to the first prong of the test, to wit, that he is a qualified individual with a disability.  There is also no dispute that Mr. Monroe was terminated, which constitutes an adverse employment action.  Accordingly, the only prongs of the indirect test that are at issue in this case are the second and fourth prongs, namely, whether Mr. Monroe was meeting INDOT's legitimate employment expectations at the time of his termination and whether similarly situated non-disabled individuals were treated more favorably.  Under the circumstances before us here, our analysis of Mr. Monroe's performance of his employment responsibilities merges with the pretext inquiry because INDOT's proffered nondiscriminatory reason for Mr. Monroe's discharge is his alleged failure to meet INDOT's legitimate job expectations as a result of his conduct on January 24, 2013.  *See Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013); *Vaughn v. Vilsack*, 715 F.3d 1001, 1007 (7th Cir. 2013).

Mr. Monroe's employment records establish and Defendants do not dispute that he had a lengthy and positive employment record with INDOT and that he received "exceeds expectation" ratings on his 2010, 2011, and 2012 annual evaluations with the 2012 annual evaluation being completed less than one month before his termination.  However, INDOT asserts that Mr. Monroe was nonetheless failing to meet its legitimate employment expectations at the time of his termination as a result of his conduct during the January 24 incident, following which a number of his subordinates complained to

21

management regarding Mr. Monroe's ongoing abusive treatment of them and stated that they would no longer work under such conditions.  INDOT immediately initiated an investigation into the allegations against Mr. Monroe which included interviewing all of the employees he supervised.  Some employees spoke positively about Mr. Monroe and his leadership while a number of other employees stated that he was "demeaning" and "threatening" and that he "picked on" one employee in particular.  Dkt. 42-8.

At the time the investigation into the January 24 incident began, Mr. Monroe had not yet visited a therapist or other medical professional or been diagnosed with depression or PTSD.  On January 28, 2013, INDOT supervisors spoke with Mr. Monroe about the allegations regarding the January 24 incident.  Mr. Monroe testified that at that meeting, he told his supervisors that he had spoken with a therapist and INDOT spoke with Mr. Monroe about the allegations on January 28, 2013.  At that meeting, Mr. Monroe reported to his supervisors that he believed he had PTSD because the woman to whom he had spoken on the telephone in an effort to schedule a therapy appointment had said it "sounded" to her like he had PTSD.  Upon completion of its investigation, INDOT determined that due to the severity of the allegations against Mr. Monroe, termination was appropriate.  INDOT terminated Mr. Monroe on February 4, 2013.

To demonstrate pretext a plaintiff must show "such weaknesses, implausibilities, inconsistencies, or contradictions in [the employer's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the employer] did not act for the asserted non-discriminatory reasons."  *Boumehdi v. Plastag Holdings, LLC,*

489 F.3d 781, 792 (7th Cir. 2007) (citation omitted).  Mr. Monroe's contentions and evidence fall well short of satisfying that burden here.  First, we highlight the fact that when the investigation into the January 24 incident was initiated, INDOT was not even on notice that Mr. Monroe suffered from a disability as he had not at that time shared with INDOT that he suspected he might have a disability and he did not receive a diagnosis until January 29, 2013, which was the first time he had ever been seen by a therapist or other medical professional.

In addition, there is no indication that the investigation conducted by INDOT following the January 24 incident was deficient or in any way a sham proceeding.  Rather, the evidence gathered as a result of that investigation corroborates INDOT's assertion that a number of Mr. Monroe's subordinates reported that he had engaged in continuing threatening and demeaning and abusive conduct and that they no longer felt comfortable working for him.  Mr. Monroe points to the fact that other of his subordinates were supportive and complimentary of his leadership and argues that INDOT made the wrong decision in terminating him.  But to demonstrate pretext, it is insufficient to show merely that the employer's "stated reason was inaccurate or unfair"; instead a plaintiff must establish that the employer did not "honestly believe" the reasons it offered to explain its actions.  *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506 (7th Cir. 2014).  In other words, pretext requires "more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'"  *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quoting

23

*Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)).  Mr. Monroe has

failed to establish such evidence here.

Mr. Monroe contends that INDOT's treatment of similarly situated non-disabled

employees establishes that its nondiscriminatory reason for his termination is pretextual.

Specifically, Mr. Monroe identifies Jim Branson, Jim Patrick, and Jeff Wilson as non-

disabled comparators who received more favorable treatment.  It is true that evidence that

similarly situated employees outside the protected class were treated differently can

establish pretext.  *Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012)

("[C]omparator evidence can do 'double-duty' at both the prima facie and pretext

stages.").  However, we are not persuaded that any of the identified comparators are in

fact similarly situated to Mr. Monroe.

A similarly situated employee need not be "identical," *Caskey v. Colgate-

Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008), but he must be "directly comparable to

the plaintiff in all material respects."  *Naik v. Boehringer Ingelheim Parm, Inc.*, 627 F.3d

596, 600 (7th Cir. 2010) (quotation marks and citation omitted).  This typically "entails a

showing that the two employees dealt with the same supervisor, were subject to the same

standards, and had engaged in similar conduct without such differentiating or mitigating

circumstances as would distinguish their conduct or the employer's treatment of them."

*Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

Here, Mr. Monroe contends that each of the identified comparators engaged in

similarly serious, if not more egregious conduct than his, but were not terminated.  We

need not delve too deeply into the specifics regarding each comparator's conduct, however, because the undisputed evidence establishes that Mr. Monroe's behavior was assessed under a different employment policy than the conduct of most of his alleged comparators.  Specifically, between January 11, 2005 and July 1, 2011, all INDOT employees were deemed "non-merit" employees and as such, could appeal suspensions, demotions, and terminations through the State Employee Appeals Commission under a "just cause" standard.  Defs.' Exh. R ¶ 4.  On July 1, 2011, laws were enacted and codified at Indiana Code § 4-15-2.2, *et seq.*, which, among other actions, redefined State employment categories.  Under this statute, all INDOT employees became "unclassified" employees, defined under the statute as employees at will who serve at the pleasure of the employee's appointing authority and may be dismissed, demoted, disciplined, or transferred for any reason that does not contravene public policy.  IND. CODE § 4-15-2.2-24.  Like non-merit employees, unclassified employees may also request an appeal of a suspension, demotion, or termination through the State Employee Appeals Commission, but an "at will" standard rather than the "just cause" standard applies.  Defs. Exh. R at ¶ 5.

Given this change in the statutes governing employees of the State, it would be inappropriate to compare any decision pertaining to discipline of a non-merit INDOT employee prior to July 1, 2011 with discipline given to an unclassified INDOT employee after the 2011 statute took effect and the standard of review for any appeal changed from a "just cause" standard to "at will."  Accordingly, Jim Patrick, who was disciplined in

September 2007 cannot be considered similarly situated to Mr. Monroe for purposes of comparison.  Likewise, the record shows that the more favorable treatment received by Jeff Wilson occurred prior to July 1, 2011.  When he again engaged in improper conduct following the statute's enactment, he received the same treatment Mr. Monroe did in this case, to wit, he was given the option to resign or be terminated and he chose resignation. The fact that he was treated more leniently before the statute went into effect but received the same treatment as Mr. Monroe when they were both governed by the same employment policies and standards in no way establishes pretext.

Jim Branson is the only identified comparator who received discipline following the statute's enactment in 2012 and was treated arguably more favorably than Mr. Monroe.  Nevertheless, we find that the differences in the conduct between the two are distinguishable such that INDOT's different treatment of them is insufficient to raise an inference of discrimination or to establish pretext.  Mr. Branson was initially given a three-day suspension in February 2012 following an incident in which he acted inappropriately in dealing with mechanics who wanted to take the truck he was using. Then, in May 2013, he was demoted and received a 9% pay cut for "repeated and consistent inappropriate conduct in performing management and supervisory duties." Defs.' Exh. Q at 84.  Although Mr. Branson apparently failed to perform his supervisory duties to INDOT's satisfaction, unlike Mr. Monroe's situation, there is no indication that a significant number of Mr. Branson's subordinates reported that they could no longer work for him or that he was accused by his subordinates of mistreatment.  Moreover,

even if Mr. Branson's conduct can be said to be comparable to Mr. Monroe's, the fact that INDOT on one occasion may have disciplined one non-disabled employee slightly more leniently than Mr. Monroe is insufficient to defeat summary judgment in light of the overwhelming evidence that INDOT terminated Mr. Monroe for a legitimate non-discriminatory reason. Accordingly, Defendants are entitled to summary judgment on Mr. Monroe's discriminatory termination claim.[5]

### 3.    Failure to Provide Reasonable Accommodation

Mr. Monroe also alleges that INDOT violated both the ADA and the Rehabilitation Act by failing to provide him a reasonable accommodation. In addition to proving he is a qualified individual with a disability, a point which we have addressed above, in order to establish a claim for failure to accommodate under either the ADA or the Rehabilitation Act, a plaintiff must also show that his employer was: (1) aware of his disability; and (2) that his employer failed to reasonably accommodate that disability. *Povey v. City of Jeffersonville*, 697 F.3d 619, 622 (7th Cir. 2012) (citing *Miller v. Ill. Dep't of Transp.*, 643 F.2d 190 (7th Cir. 2011)).

Mr. Monroe claims that INDOT failed to provide him a reasonable accommodation when it denied his request first in December 2012 and then again in January 2013 to transfer to a day shift position. INDOT contends that Mr. Monroe's

---

[5] Because we have determined that INDOT's termination decision was nondiscriminatory, we need not address Mr. Monroe's contention that his supervisors ignored his request for a reasonable accommodation (i.e., to be transferred to a Highway Tech position) on January 29, 2013 when the investigation into his conduct that resulted in his termination had already begun.

accommodation claim cannot survive summary judgment because the undisputed evidence shows that it had no knowledge that he suffered from a disability at the time it declined to transfer him to a day shift position, and further, that the accommodation requested by Mr. Monroe was unreasonable as there were no day shift positions then available.

The evidence establishes that Mr. Monroe requested to be moved to a day shift position on two occasions, once in early December 2012 and then again at some point before January 24, 2013. It is undisputed that Mr. Monroe never attended a therapy session until January 29, 2013 and was not diagnosed with depression and PTSD until that date, which was *after* both of his requests for a transfer. At the time he requested the transfer, Mr. Monroe told his supervisors only that he was "burnt out," that he "couldn't sleep, couldn't concentrate," that he thought there was "something wrong" with him and that he wanted to be moved to the day shift. Monroe Dep. at 35, 80-81.

It is true, as Mr. Monroe argues, that an individual need not use any particular "magic words" to request an accommodation, and, if it appears that an employee may need an accommodation but does not know how to ask for one, an employer cannot put its head in the sand and avoid inquiring further. However, while we recognize that "some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability," (*Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928, 934 (7th Cir. 1995)), that is not the case here. Mr. Monroe's vague and conclusory statements regarding being tired all the time and "burnt

28

out" without any prior indication of mental health issues could not possibly have put INDOT on notice that he may have been suffering from a disability requiring accommodation. Defendants are therefore entitled to summary judgment on Mr. Monroe's claims that INDOT failed to provide him a reasonable accommodation when it failed to transfer him to a day shift position in December 2012 and January 2013 because it was not made aware that he had a disability at that time.[6]

## III.   Conclusion

For the reasons detailed above, Defendants' Motion for Summary Judgment is <u>GRANTED</u>. Final judgment shall issue accordingly.

IT IS SO ORDERED.

Date:   _____3/31/2016_____          _Sarah Evans Barker_____
                                             SARAH EVANS BARKER, JUDGE
                                             United States District Court
                                             Southern District of Indiana

---

[6] Even if INDOT had been aware of Mr. Monroe's disability at the time it denied his request to be transferred to a day shift position, his claim nonetheless fails because such a transfer would not have been a reasonable accommodation under the circumstances. In response to INDOT's argument that he was requesting that a new position be created for him, Mr. Monroe states that he was not asking that a new position be created, but merely that, as a training opportunity, he be allowed to switch places with an employee on day shift. However, "[a]n employer is not required to 'bump' another employee in order to create a vacancy for the disabled employee." *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159 (7th Cir. 1997) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir. 1996)).

Distribution:

Rebecca A. Brelage
INDIANA ATTORNEY GENERAL
rebecca.brelage@atg.in.gov

Jason P. Cleveland
JOHN H. HASKIN & ASSOCIATES
jcleveland@jhaskinlaw.com

John H. Haskin
JOHN H. HASKIN & ASSOCIATES
jhaskin@jhaskinlaw.com

Meghan Uzzi Lehner
JOHN H. HASKIN & ASSOCIATES
mlehner@jhaskinlaw.com

Eric J Hartz
JOHN H. HASKIN & ASSOCIATES, LLC
ehartz@jhaskinlaw.com